# United States Court of Appeals
## For the First Circuit

---

No. 11-2281

STACEY HIGHTOWER,

Plaintiff, Appellant,

v.

CITY OF BOSTON; EDWARD DAVIS, Boston Police Commissioner;
COMMONWEALTH OF MASSACHUSETTS,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Denise J. Casper, U.S. District Judge]

---

Before

Lynch, Chief Judge,
Lipez and Thompson, Circuit Judges.

---

Alan Gura, with whom Gura & Possessky, PLLC, and Chester
Darling were on brief, for appellant.
Lisa Skehill Maki, Assistant Corporation Counsel, with
whom William F. Sinnott, Corporation Counsel, was on brief, for
appellees City of Boston and Edward Davis.
Kenneth W. Salinger, Assistant Attorney General, with whom
Martha Coakley, Attorney General of Massachusetts, was on brief, for
appellee Commonwealth of Massachusetts.
Charles M. Dyke and Trucker Huss APC on brief for Legal
Community Against Violence, amicus curiae.

August 30, 2012

**LYNCH, <u>Chief Judge</u>.** This case presents an as-applied and a purported facial attack on the Massachusetts statutory and administrative scheme for revoking licenses for the carrying of firearms. The district court entered summary judgment dismissing the claims. <u>Hightower</u> v. <u>City of Boston</u>, 822 F. Supp. 2d 38, 65-66 (D. Mass. 2011).

Stacey Hightower is a former Boston Police officer who, during many of her years of service from 1998 to 2008, had a broad Class A license which permitted her to carry and to conceal a large capacity firearm, in addition to her Boston Police Department (BPD) service gun. Shortly after her resignation from the BPD, her license was revoked because the BPD determined that she had inaccurately answered a question on her license renewal form. The question was whether she had any complaints or charges pending against her. After the revocation, she neither invoked her right to judicial review nor sought a more limited license which would have entitled her to carry her small handgun.

On the facts of this case, we hold that Hightower has standing to bring her claims, that the case is ripe, that her Second Amendment as-applied claim fails, that her purported Second Amendment facial attack also fails, and that her procedural due process claim fails, as does her equal protection claim. We affirm entry of judgment against Hightower.

I.

The facts giving rise to this suit are largely undisputed.

A.        <u>Massachusetts Firearms Licensing & License Revocation Statute</u>

Massachusetts has three categories of licenses available for the carrying of firearms:[1] a firearms identification card (FID card), a Class B license, and a Class A license.  <u>See</u> Mass. Gen. Laws ch. 140, §§ 129B, 131.  All three are issued by the relevant "licensing authority," which is defined as "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them."  <u>Id.</u> § 121.  It is generally a crime under Massachusetts law to carry a firearm without having the appropriate license or FID card, or being exempt from licensing.  <u>Id.</u> ch. 269, § 10.  As the Massachusetts Supreme Judicial Court has explained:

> "To lawfully 'carry' a firearm within the Commonwealth . . . a person must either obtain a license to do so under G.L. c. 140, § 131, or be exempt from the normal licensing requirements under G.L. c. 140, §§ 129C, 131F, or 131G . . . ."  There is one other exemption.  A person who obtains a "firearm identification card" under G.L. c. 140, § 129B, allowing him or her to possess a firearm legally, may carry a firearm within his or her residence or place of business without violating the law.

---

[1]  The Massachusetts licensing scheme defines a firearm as "a pistol, revolver or other weapon of any description" with a barrel of "less than 16 inches" in length.  Mass. Gen. Laws ch. 140, § 121.

Commonwealth v. Ramirez, 555 N.E.2d 208, 211 (Mass. 1990) (omissions in original) (citations omitted) (quoting Commonwealth v. Seay, 383 N.E.2d 828, 831 (Mass. 1978)).

A sworn BPD officer is not required to have a license to carry a BPD-issued firearm. See Mass. Gen. Laws ch. 140, § 129C(o) (listing "exempted persons and uses" as including "police officers and other peace officers of any jurisdiction, in the performance of their official duty or when duly authorized to possess them"); see also id. ch. 41, § 98 (police officers "may carry within the commonwealth such weapons as the chief of police or the board or officer having control of the police in a city or town shall determine"). This dispute is not about Hightower's police firearm, but her private one.

An FID card "allows the holder to own, transfer, or possess a firearm in his residence or place of business." Commonwealth v. Gouse, 965 N.E.2d 774, 785 n.14 (Mass. 2012). Various statutory requirements and exemptions govern the issuance of FID cards. See Mass. Gen. Laws ch. 140, §§ 129B, 129C. Notably, there is no "suitable person" requirement for issuance of FID cards, as there is for Class A and B licenses; the licensing authority "shall issue" an FID card unless the applicant falls within one of the statute's enumerated categories of ineligible individuals. Id. § 129B(1).

A Class B license entitles "a holder thereof to purchase, rent, lease, borrow, possess and carry: (i) non-large capacity firearms . . . and (ii) rifles and shotguns, including large capacity rifles and shotguns." Id. § 131(b). "Large capacity" firearms include any semi-automatic firearms "capable of accepting, or readily modifiable to accept, any detachable large capacity feeding device," and a "[l]arge capacity feeding device" is defined to include any magazine or similar item that can hold "more than ten rounds." Id. § 121. Class B licenses "shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place," "shall not entitle the holder thereof to possess a large capacity firearm," and are to be issued "subject to such restrictions relative to the possession, use or carrying of such firearm as the licensing authority deems proper." Id. § 131(b).

Class A licenses provide the same privileges as Class B licenses, except that the holder may possess "large capacity firearms," and the statute does not preclude possession or carrying of concealed firearms in public. Id. § 131(a). Class A licenses are issued "subject to such restrictions relative to the possession, use or carrying of firearms as the licensing authority deems proper," id., which can include preventing the carrying of concealed weapons in public.

-6-

Both licenses are governed by the same application procedures, eligibility requirements, and revocation procedures. Individuals may submit an application for a Class A or Class B license, or for renewal of such license, to the licensing authority of the jurisdiction of their place of residence or place of business. Id. § 131(d). Any applicant who "knowingly files an application containing false information" may be punished by fine or imprisonment for "not less than six months nor more than two years." Id. § 131(h).

As to eligibility, the statute provides seven categories of individuals who are not eligible to receive a license: (1) individuals who have been convicted of a felony, a misdemeanor punishable by imprisonment for more than two years, or certain other crimes, (2) individuals who "ha[ve] been confined to any hospital or institution for mental illness," unless the applicant submits an affidavit of a physician attesting that "the applicant is not disabled by such an illness in a manner that should prevent such applicant from possessing a firearm," (3) those who are or have been "under treatment for or confinement for drug addiction or habitual drunkenness, unless such applicant is deemed to be cured of such condition by a licensed physician," (4) those under the age of twenty-one, (5) aliens, (6) individuals currently subject to certain restraining orders, and (7) individuals "currently the subject of an outstanding arrest warrant." Id. § 131(d)(i)-(vii).

-7-

If an individual, like the plaintiff here, is not rendered statutorily ineligible as a result of falling into one of those categories, the licensing authority

> may issue [a Class A or Class B license] if it appears that the applicant is a suitable person to be issued such license, and that the applicant has good reason to fear injury to his person or property, or for any other reason, including the carrying of firearms for use in sport or target practice only, subject to such restrictions expressed or authorized under this section.

Id. § 131(d).

The licensing authority must make a decision on the application within forty days from the date of application; if the application is denied, the authority must "notify the applicant of the reason for such denial in writing." Id. § 131(e). If granted, both Class A and Class B licenses "shall be valid, unless revoked or suspended, for a period of not more than 6 years from the date of issue," and are to expire on the licensee's date of birth. Id. § 131(i).

As to suspension or revocation of licenses, which is at the heart of this case, the statute provides:

> A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed. A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license. Any revocation or

-8-

> suspension of a license shall be in writing
> and shall state the reasons therefor.

Id. § 131(f).

If a license is suspended or revoked, or an application is denied, the aggrieved individual may "file a petition to obtain judicial review in the district court" within ninety days of the denial, revocation, or suspension. Id. § 131(f).[2] "A justice of such court, after a hearing, may direct that a license be issued or reinstated to the petitioner if such justice finds that there was no reasonable ground for denying, suspending or revoking such license and that the petitioner is not prohibited by law from possessing same." Id. Further judicial review may be had "in an action in the nature of certiorari under" Mass. Gen. Laws ch. 249, § 4. Levine v. Chief Justice of the Dist. Court, 750 N.E.2d 998, 1000 (Mass. 2001).

If a Class A or B license is revoked or suspended, "the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of section 129D. No appeal or post-judgment motion shall operate to stay such revocation or suspension." Mass. Gen. Laws ch. 140, § 131(f).

Section 129D, in turn, provides:

---

[2]  It appears that an applicant may also petition for review of a decision to issue a restricted, as opposed to unrestricted, license. See Ruggiero v. Police Comm'r of Bos., 464 N.E.2d 104, 105-06 (Mass. App. Ct. 1984).

-9-

> Upon revocation, suspension or denial of an application for a firearm identification card . . . or of any firearms license if said firearms identification card is not then in force . . . , the person whose application was so revoked, suspended or denied shall without delay deliver or surrender, to the licensing authority where he resides, all firearms, rifles, shotguns and machine guns and ammunition which he then possesses <u>unless an appeal is pending</u>.

Id. § 129D (emphasis added).

That section further provides that "[s]uch person, or his legal representative, shall have the right, at any time up to one year after said delivery or surrender, to transfer such firearms . . . to any licensed dealer or any other person legally permitted to purchase or take possession of such firearms," and requires the licensing authority to transfer such firearms upon receiving written notice. Id.

B.      Factual Background

Stacey Hightower, a resident of Boston, served as a police officer for the City of Boston from June 1998 until August 15, 2008. Hightower initially applied for and received from the licensing authority for the City of Boston a Class A license to carry large capacity firearms in 2000. That license was "unrestricted," meaning that Hightower was authorized to carry firearms "for all lawful purposes," including carrying firearms concealed in public. Pursuant to this license, Hightower possessed a .38 caliber five-round revolver, which was a personal firearm she

-10-

owned in addition to her BPD-issued firearm.  A BPD officer must possess a Class A license to carry a concealed non-BPD-issued firearm in public; no license is required to carry a BPD-issued firearm.  See Mass. Gen. Laws § 129C(o) (listing "exempted persons and uses" as including "police officers and other peace officers of any jurisdiction, in the performance of their official duty or when duly authorized to possess them").

Hightower's Class A license lapsed in March 2008.  In July 2008, Hightower filed an application to renew her Class A license.  To renew the license, Hightower had to fill out, in addition to the ordinary renewal form, a Form G 13-S, which was specific to Boston Police officers, who were required to fill out that form when applying for or renewing firearms licenses.[3]  One of the questions on the G 13-S form was "Are there any complaints or charges pending against you?"  Hightower answered "No" to that question.[4]  Hightower's renewal was approved without restrictions on August 1, 2008.

_____

[3]  The ordinary application form is signed under penalty of perjury and states that "I declare the above facts are true and complete to the best of my knowledge and belief and I understand that any false answer(s) will be just cause for denial or revocation of my license to carry firearms."  The G 13-S form contains no similar statements, nor does it state that it is signed under penalty of perjury.

[4]  The ordinary application form contains the question "Are you now under any charge(s) for any offense(s) against the law?" Hightower answered "No" to this question.  The defendants do not claim that this answer was inaccurate or untruthful.

Hightower resigned from the Boston Police on July 31, 2008, effective August 15, 2008. On August 18, 2008, a "Police Commissioner's Personnel Order" was placed into her file without her endorsement, stating that her resignation had been "presented with charges pending." The BPD officer in charge of the Licensing Unit, which is responsible for issuing firearms licenses within the City of Boston, reviewed this order. After confirming with BPD Internal Affairs that Hightower, in BPD's view, had charges pending against her when she resigned, the Licensing Unit officer determined that Hightower had been untruthful in her answer on the G 13-S. Accordingly, the officer sent her a letter revoking her Class A license and stating the reasons.

On August 20, 2008, Hightower received the letter revoking her Class A license on the grounds that she "completed the application form untruthfully." The parties agree that the basis for this conclusion was that, in the view of the defendants, Hightower in fact had "complaints or charges" pending when she filled out the license renewal form, contrary to her answer on the form.

The pending internal affairs charges related to a 2004 complaint by an individual that he had been assaulted at the booking desk by a police officer (not Hightower) after his arrest. Hightower had transported the prisoner from the location of his arrest to the police station. Hightower was interviewed by BPD

-12-

Internal Affairs investigators regarding the complaint. In 2005, BPD Internal Affairs investigators found that Hightower had violated three BPD rules, including "Abuse of Process Withholding Information" during the investigation into the complaint. Hightower received a letter dated November 4, 2005, which stated that these findings had been made by the investigators. Hightower testified at her deposition that she understood one of the findings of the investigators was that she had not been truthful during the investigation. Hightower internally appealed those findings and had entered into settlement negotiations regarding the violations, but had yet to resolve the matter at the time she resigned from the BPD. The parties dispute whether the status of that matter at the time Hightower filled out Form G 13-S amounted to "pending" "complaints or charges" within the meaning of the form, and also dispute whether Hightower remained aware of the status of her internal affairs matter.

The license revocation letter informed Hightower that she was entitled to "appeal this decision with 90 days to the District Court with appropriate jurisdiction." Hightower chose not to appeal the revocation. Hightower never contacted the BPD to inquire as to whether she had in fact answered a question on the form untruthfully.

Hightower has also never filed another application for either a Class A license, Class B license, or FID card after she

left the Boston Police. Because Hightower is no longer a BPD officer, she would not need to fill out a Form G 13-S were she to apply for a Class A license. The defendants maintain that if Hightower applied for a Class A license, she would receive a restricted license (assuming that she is not statutorily disqualified), and if she desired an unrestricted license, the licensing authority would "make a determination based on her needs and the interests of the Boston police department in regulating Class A unrestricted licenses."

The license revocation letter also stated that Hightower "shall, in accordance with M.G.L. c. 140, § 129D, without delay, deliver or surrender to the licensing authority where you reside your licenses to carry, and all firearms." Section 129D provides that "[u]pon revocation, suspension or denial of an application for a firearm identification card . . . or of any firearms license if said firearms identification card is not then in force," the person whose application or license was revoked, suspended, or denied "shall without delay deliver or surrender . . . all firearms . . . which he then possesses <u>unless an appeal is pending</u>." Mass. Gen. Laws ch. 140, § 129D (emphasis added). Hightower surrendered her firearm after receiving the revocation letter.

C.        Procedural History

Hightower filed suit in federal court on November 24, 2008.  The complaint, as amended, named as defendants the City of Boston and the Boston Police Commissioner.  The complaint alleged that the revocation of her Class A license was unconstitutional, under several theories: (1) the Second Amendment, (2) procedural due process, (3) substantive due process, and (4) equal protection.  The complaint requested as relief (1) return of Hightower's revolver, (2) an order restoring Hightower's Class A license, (3) a permanent injunction preventing "enforc[ement] [of] the customs, policies, and practices complained of," and (4) attorneys' fees.

The Commonwealth of Massachusetts intervened as a defendant in February 2011.  The parties filed cross-motions for summary judgment, and on September 29, 2011, the district court granted summary judgment in favor of the defendants.  Hightower, 822 F. Supp. 2d at 65-66.

II.

Our review of the district court's grant of summary judgment is de novo, assessing the facts and the inferences to be drawn from them in the light most favorable to the non-moving party.  Valley Forge Ins. Co. v. Field, 670 F.3d 93, 96-97 (1st Cir. 2012).  All of Hightower's claims on appeal present questions of law, which we review de novo.  United States v. Rehlander, 666

F.3d 45, 47 (1st Cir. 2012) ("The issues before us are legal and our review is therefore de novo.").

Hightower raises three arguments on appeal: (1) that the revocation of her license, and Massachusetts's firearms licensing scheme, violate the Second Amendment; (2) that the same revocation and licensing scheme violate the Equal Protection Clause of the Fourteenth Amendment; and (3) that the revocation violated the Due Process Clause of the Fourteenth Amendment.

The defendants argue that Hightower's Second Amendment claim is not ripe. We address ripeness and other preliminary matters before turning to each of Hightower's claims.

A.      Preliminary Issues

Hightower has met the requirements for both standing and ripeness to assert claims for denial of procedural due process and equal protection, and for violation of any Second Amendment rights arising from the revocation of her license.

As to standing to bring at least claims as to the Class A license, it is clear that the revocation of Hightower's license constitutes an injury that suffices to satisfy the minimum requirements of Article III standing, regardless of whether Hightower can apply for another license. See Katz v. Pershing, LLC, 672 F.3d 64, 71-72 (1st Cir. 2012) (outlining elements of Article III standing); see also, e.g., Parker v. District of Columbia, 478 F.3d 370, 376 (D.C. Cir. 2007) ("We have consistently

-16-

treated a license or permit denial pursuant to a state or federal administrative scheme as an Article III injury."), aff'd sub nom. District of Columbia v. Heller, 128 S. Ct. 2783 (2008).

Hightower's as-applied claim extends only to the characteristics of the license that was revoked -- a Class A unrestricted license that allows for carrying of concealed, large capacity weapons outside the home. Hightower lacks standing to raise a claim as to a Class B license; she has never applied for such a license, been denied one, or had such a license revoked. Such a license would allow her to carry a non-concealed,[5] non-large capacity weapon in public.[6] For the same reason, she lacks standing as to an FID card, which would allow her to possess a firearm in her home or place of business.

---

[5] The statute only prevents the holder of a Class B license from "carry[ing] or possess[ing] a loaded firearm in a concealed manner in any public way or place." Mass. Gen. Laws ch. 140, § 131(b) (emphasis added).

[6] Hightower asserts that "the Boston police apparently do not issue unrestricted Class B licenses to openly carry revolvers and other non-large capacity handguns," and so, de facto, the only way for her to carry a firearm, openly or not, outside her home is with an unrestricted Class A license.

Hightower cites no authority for this proposition, aside from certain comments that do not address the matter made by defense counsel at a hearing. The statute itself only provides that Class B licenses "shall not entitle the holder thereof to carry or possess a loaded firearm in a concealed manner in any public way or place." Mass. Gen. Laws ch. 140, § 131(b) (emphasis added). The defendants claim that "a Class B license is sufficient to keep a regular capacity firearm, rifle, or shotgun in one's home or to carry it openly in public." The defendants also point out that Hightower could apply for a restricted Class A license that would allow her to carry a firearm in public.

-17-

As to ripeness, the fact that Hightower can apply for another type of license that would redress her injury of not being licensed for her small gun does not render her claim unripe. See Gastronomical Workers Union Local 610 & Metro. Hotel Ass'n Pension Fund v. Dorado Beach Hotel Corp., 617 F.3d 54, 61-62 (1st Cir. 2010) ("[T]he [ripeness] claim is that a future event may change the type of remedy available to redress an existing injury. Consequently, it is the future event, not the . . . injury, that is speculative.  Viewed in this light, [the] argument is not a ripeness argument at all."); see also Kachalsky v. Cacace, 817 F. Supp. 2d 235, 249 (S.D.N.Y. 2011) (rejecting similar argument in a Second Amendment case because "[t]hat state licensing officers might grant Individual Plaintiffs' second full-carry permit applications were they to submit such applications at some point in the future does not suggest that their current injuries are speculative").

However, both the existence of various firearms licenses for which Hightower could apply and the fact that Hightower has not applied for such licenses do impact the arguments Hightower can properly raise on the merits of her claims, as discussed below.

B.        Second Amendment Claims

        1.    As-Applied Claim

Hightower argues that she is entitled to a declaration that the Second Amendment secures the right to publicly carry a

handgun outside of her home for self defense, and that this right cannot be made to depend on a suitability determination by licensing officials.  Hightower also requests injunctive relief.

Hightower argues that the Class A license is the only form of Massachusetts license that would allow her to exercise the Second Amendment right she claims to have.  For Hightower's as-applied Second Amendment challenge to the license revocation to succeed, then, Hightower must prove that denial of the additional benefits granted by an unrestricted Class A license, over and above those granted by a Class B license, amounted to a Second Amendment violation.  As we understand it, although Hightower made no firm commitment on the record as to this point, she does not in fact desire a license for a large capacity firearm, and her personal firearm is not a large capacity weapon.  In any event, she has presented no argument about why the possession or carrying of large capacity weapons is protected from any form of government regulation by the Second Amendment.  That the license lost allowed carrying of large capacity weapons weakens the Second Amendment claim, as District of Columbia v. Heller, 128 S. Ct. 2783 (2008), was concerned with weapons of the type characteristically used to protect the home.[7]  She does wish to be licensed to carry her small

_____

[7] The D.C. Circuit has, applying intermediate scrutiny, upheld a prohibition on the possession of magazines with a capacity of more than ten rounds of ammunition.  Heller v. District of Columbia, 670 F.3d 1244, 1261-64 (D.C. Cir. 2011).

-19-

gun as a concealed weapon and argues that those interests are protected by the Second Amendment and the revocation is unconstitutional. In her favor, we examine her more limited claim. To succeed on her Second Amendment claim, Hightower would have to show that the license revocation, as applied to her ability to carry concealed handguns in public, amounts to a Second Amendment violation.

The Second Amendment applies to state and local regulation of firearms. McDonald v. City of Chicago, 130 S. Ct. 3020, 3026 (2010). In Heller, the Court held, inter alia, that a law that "totally bans handgun possession in the home" violated the Second Amendment. 128 S. Ct. at 2817, 2821. The Court required the District of Columbia to "permit [the plaintiff] to register his handgun and . . . issue him a license to carry it in the home," if the plaintiff was not disqualified. Id. at 2822. The Court stressed that "the home" is "where the need for defense of self, family, and property is most acute," id. at 2817, and explained that the Second Amendment "elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home," id. at 2821 (emphasis added).

Courts have consistently recognized that Heller established that the possession of operative firearms for use in defense of the home constitutes the "core" of the Second Amendment. See, e.g., United States v. Booker, 644 F.3d 12, 25 n.17 (1st Cir.

-20-

2011) ("While we do not attempt to discern the 'core' Second Amendment right vindicated in Heller, we note that Heller stated that the Second Amendment 'elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting Heller, 128 S. Ct. at 2821)), cert. denied, 132 S. Ct. 1538 (2012); United States v. Greeno, 679 F.3d 510, 517 (6th Cir. 2012) ("The core right recognized in Heller is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting Heller, 128 S. Ct. at 2821)); GeorgiaCarry.Org, Inc. v. Georgia, No. 11-10387, 2012 WL 2947817, at *7 (11th Cir. July 20, 2012) (to be published in F.3d) (noting that the Heller Court "went to great lengths to emphasize the special place that the home -- an individual's private property -- occupies in our society"); United States v. Barton, 633 F.3d 168, 170 (3d Cir. 2011) ("At the 'core' of the Second Amendment is the right of 'law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting Heller, 128 S. Ct. at 2821)); United States v. Staten, 666 F.3d 154, 158 (4th Cir. 2011) ("According to the Court, the core right of the Second Amendment is 'the right of law-abiding, responsible citizens to use arms in defense of hearth and home.'" (quoting Heller, 128 S. Ct. at 2821)), cert. denied, 132 S. Ct. 1937 (2012); United States v. Reese, 627 F.3d 792, 800 (10th Cir. 2010) ("[T]he Court suggested that the core purpose of the right was to allow 'law-abiding,

responsible citizens to use arms in defense of hearth and home.'" (quoting Heller, 128 S. Ct. at 2821)), cert. denied, 131 S. Ct. 2476 (2011). It is plain that the interest Hightower advances in carrying concealed weapons outside the home is distinct from this core interest emphasized in Heller.[8]

---

[8] We do not reach the issue of the scope of the Second Amendment as to carrying firearms outside the vicinity of the home without any reference to protection of the home. Some courts appear to have held that the Second Amendment does not extend outside the home. See Shepard v. Madigan, No. 11-CV-405-WDS, 2012 WL 1077146, at *10 (S.D. Ill. Mar. 30, 2012) (to be published in F. Supp. 2d) ("[T]he bearing of a firearm outside the home is not a core right protected by the Second Amendment."); Moore v. Madigan, 842 F. Supp. 2d 1092, 1101 (C.D. Ill. 2012) (holding that Heller and McDonald do not "recognize[] a Second Amendment right to bear arms outside of the home"); Piszczatoski v. Filko, 840 F. Supp. 2d 813, 829 (D.N.J. 2012) ("Given the considerable uncertainty regarding if and when the Second Amendment rights should apply outside the home, this Court does not intend to place a burden on the government to endlessly litigate and justify every individual limitation on the right to carry a gun in any location for any purpose."); Williams v. State, 10 A.3d 1167, 1169, 1177 (Md. 2011) (holding that a statute prohibiting carrying a handgun outside the home without a permit "is outside of the scope of the Second Amendment" and noting that "[i]f the Supreme Court . . . meant its holding to extend beyond home possession, it will need to say so more plainly"), cert. denied, 132 S. Ct. 93 (2011); Commonwealth v. Perez, 952 N.E.2d 441, 451 (Mass. App. Ct. 2011) ("The Second Amendment does not protect the defendant in this case because he was in possession of the firearm outside his home.").

Other courts have remarked that the application of the Second Amendment outside the home is far from clear. See Gonzalez v. Village of West Milwaukee, 671 F.3d 649, 659 (7th Cir. 2012) (referring to this issue as "unsettled territory"); United States v. Masciandaro, 638 F.3d 458, 475 (4th Cir. 2011) (noting that "[t]here may or may not be a Second Amendment right in some places beyond the home," and that "[o]n the question of Heller's applicability outside the home environment, we think it prudent to await direction from the Court itself"), cert. denied, 132 S. Ct. 756 (2011); Kachalsky v. Cacace, 817 F. Supp. 2d 235, 265 (S.D.N.Y. 2011) (noting that "according Second Amendment protection to the carrying of an unconcealed weapon outside the home would certainly

Under current Supreme Court precedent, Hightower cannot make out her Second Amendment claim as to the concealed weapon aspect of her revoked license, as she must for her as-applied challenge to succeed.  Under our analysis of Heller, as follows, the government may regulate the carrying of concealed weapons outside of the home.

In Heller, the Court explained that "the right secured by the Second Amendment is not unlimited" and noted that "the majority of the 19th-century courts to consider the question held that prohibitions on carrying concealed weapons were lawful under Second Amendment or state analogues."  128 S. Ct. at 2816.  We have interpreted this portion of Heller as stating that "laws prohibiting the carrying of concealed weapons" are an "example[] of 'longstanding' restrictions that [are] 'presumptively lawful' under the Second Amendment."  United States v. Rene E., 583 F.3d 8, 12 (1st Cir. 2009) (quoting Heller, 128 S. Ct. at 2816-17 & n.26); see also Robertson v. Baldwin, 165 U.S. 275, 281-82 (1897) (observing that "the first 10 amendments to the [C]onstitution" protect rights

go further than Heller did").

    Other courts have found that the Second Amendment extends outside of the home.  See United States v. Weaver, No. 2:09-cr-00222, 2012 WL 727488, at *4 (S.D. W. Va. Mar. 6, 2012); Woollard v. Sheridan, No. L-10-2068, 2012 WL 695674, at *7 (D. Md. Mar. 2, 2012) (to be published in F. Supp. 2d) ("[T]he Court finds that the right to bear arms is not limited to the home."); see also Masciandaro, 638 F.3d at 468 (Niemeyer, J., writing separately) (stating that the Second Amendment provides a right to carry a weapon outside the home, at least "in some form").

that are "subject to certain well-recognized exceptions" and stating, in dicta, that the Second Amendment right "is not infringed by laws prohibiting the carrying of concealed weapons").[9] Licensing of the carrying of concealed weapons is presumptively lawful, and Hightower makes no serious argument to the contrary.

Indeed, we do not understand her to make the implausible argument that the government may not, under the Second Amendment, ever revoke a license to carry a concealed weapon. Rather, her attack is on the standard used in the revocation of her license. We detail her arguments below.

The standards for revocation of her license stem from section 131, which provides for revocation in two circumstances:

> A license issued under this section shall be revoked or suspended by the licensing authority, or his designee, upon the occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed.

---

[9] See also Richards v. County of Yolo, 821 F. Supp. 2d 1169, 1174 (E.D. Cal. 2011) ("[T]he Second Amendment does not create a fundamental right to carry a concealed weapon in public."); Kachalsky, 817 F. Supp. 2d at 260-62 (suggesting that there is no Second Amendment right to carry concealed weapons); Martinkovich v. Oregon Legislative Body, No. 11-3065-CL, 2011 WL 7693036, at *2 (D. Or. Aug. 24, 2011) ("The Second Amendment does not prohibit regulations on carrying a concealed weapon."); Dorr v. Weber, 741 F. Supp. 2d 993, 1005 (N.D. Iowa 2010) ("[A] right to carry a concealed weapon under the Second Amendment has not been recognized to date."); Gamble v. United States, 30 A.3d 161, 164-66 (D.C. 2011) (holding that there is no Second Amendment right to carry a concealed weapon); State v. Knight, 241 P.3d 120, 133 (Kan. Ct. App. 2010) ("[T]he Heller Court considered concealed firearms prohibitions to be presumptively constitutional under the Second Amendment.").

A license may be revoked or suspended by the licensing authority if it appears that the holder is no longer a suitable person to possess such license.

Mass. Gen. Laws ch. 140, § 131(f).  A revocation on either basis is subject to judicial review.  Id.

Hightower attacks many provisions of the statute, but her key focus is on what she contends is the inherent subjectivity of the "suitability" requirement and its inadequacy as a standard. However, Hightower's license was not revoked because of a general finding that she was not "suitable," but rather because of a particular determination that she "completed the application form untruthfully."[10]

We conclude that the revocation of a firearms license on the basis of providing false information as to the existence of pending complaints or charges on the firearms license application form is not a violation of the Second Amendment in this case. Hightower argues that this court must apply strict scrutiny to her license revocation claim.  Her claim fails whatever standard of scrutiny is used, even assuming there is some Second Amendment interest in carrying the concealed weapons at issue.  We do not reach the question of what standard of scrutiny applies here.  We

_____

[10]  BPD has denied firearms applications in other instances upon a determination that applicants answered the general form untruthfully, denied applications upon a determination that sworn BPD officers answered the G 13-S form untruthfully, and revoked licenses for both reasons.

-25-

agree with Judge Wilkinson's cautionary holding in United States v. Masciandaro, 638 F.3d 458 (4th Cir. 2011), cert. denied, 132 S. Ct. 756 (2011), that we should not engage in answering the question of how Heller applies to possession of firearms outside of the home, including as to "what sliding scales of scrutiny might apply." Id. at 475. As he said, the whole matter is a "vast terra incognita that courts should enter only upon necessity and only then by small degree." Id.

A requirement that firearms license applicants provide truthful information, enforced by the revocation of licenses if the applicant provides false information, serves a variety of important purposes. For one, it helps ensure the integrity of the system of keeping prohibited persons from possessing firearms. Massachusetts's licensing scheme prohibits certain categories of people from possessing firearms. See Mass. Gen. Law ch. 140, § 131(d)(i)-(vii). A licensing authority does not necessarily possess all of the information necessary to determine an individual's eligibility. The submission of false information by an applicant could make it more difficult for the licensing authority to assess whether the applicant is eligible (e.g., submission of a false name would make it more difficult to perform a background check).[11] The prohibition of the inclusion of false

---

[11] The licensing authority is empowered to make a variety of inquiries concerning license applicants. See Mass. Gen. Laws ch. 140, § 131(e).

-26-

information in a license application is necessary to the functioning of the licensing scheme.

The Supreme Court has commented on a federal prohibition on providing material false information to a licensed dealer in connection with the acquisition of firearms, saying that 18 U.S.C. § 922(a)(6):

> was enacted as a means of providing adequate and truthful information about firearms transactions. Information drawn from records kept by dealers was a prime guarantee of the Act's effectiveness in keeping "these lethal weapons out of the hands of criminals, drug addicts, mentally disordered persons, juveniles, and other persons whose possession of them is too high a price in danger to us all to allow."

Huddleston v. United States, 415 U.S. 814, 825 (1974) (quoting 114 Cong. Rec. 13219 (1968) (remarks of Sen. Tydings)). The same holds true for Massachusetts's licensing scheme. In Huddleston, the defendant had been convicted of providing false information in answering a form in connection with the acquisition of a firearm; the Court affirmed the conviction. Id. at 815-18, 833.

A requirement that information on firearms license applications be accurate is an important government interest, and it is enforced not only by the revocation scheme. Massachusetts law makes it a criminal offense to knowingly submit false information of certain types on a firearms license application. Mass. Gen. Laws ch. 140, § 129 (providing a criminal penalty for anyone who "gives a false or fictitious name or address or

-27-

knowingly offers or gives false information concerning the date or place of birth, his citizenship status, occupation, or criminal record," in any "application for any form of license or permit issued in connection" with a firearm); id. § 131(h) (providing a criminal penalty for "[a]ny person who knowingly files an application containing false information"). Such provisions are commonplace in state firearms licensing regimes, particularly as to licenses to carry concealed weapons.[12]

---

[12] See, e.g., D.C. Code § 7-2507.04(a) ("It shall be unlawful for any person purchasing any firearm or ammunition, or applying for any registration certificate . . . to knowingly give false information or offer false evidence of identity."); Fla. Stat. Ann. § 790.06(11)(a) ("A person who knowingly files false information under this subsection is subject to criminal prosecution . . . ."); Ind. Code Ann. § 35-47-2-17 ("No person, in purchasing or otherwise securing delivery of a firearm or in applying for a license to carry a handgun, shall knowingly or intentionally: (1) give false information on a form required to: . . . (B) apply for a license to carry a handgun . . . ."); La. Rev. Stat. Ann. § 40:1379.3(C)(1) ("The providing of false or misleading information on the application or any documents submitted with the application shall be grounds for the denial or revocation of a concealed handgun permit."); Md. Code Ann., Pub. Safety § 5-139(a) ("A person may not knowingly give false information or make a material misstatement in a firearm application . . . ."); Mich. Comp. Laws Serv. § 750.232a(3) ("A person who intentionally makes a material false statement on an application for a license to purchase a pistol . . . is guilty of a felony . . . ."); Miss. Code Ann. § 45-9-101(15) ("Any person who knowingly submits a false answer to any question on an application for a license issued pursuant to this section, or who knowingly submits a false document when applying for a license issued pursuant to this section, shall, upon conviction, be guilty of a misdemeanor . . . ."); N.J. Stat. Ann. § 2C:39-10(c) ("Any person who gives or causes to be given any false information . . . in applying for . . . a permit to purchase a handgun [or] a permit to carry a handgun . . . is guilty of a crime of the third degree."); N.M. Stat. Ann. § 29-19-6(I) ("The department shall suspend or revoke a concealed handgun license if: (1) the licensee provided the department with false information on

Like the Supreme Court, we hold that this particular ground for "unsuitability" is not subjective, and it does not confer too much discretion on the licensing authority. See City of Littleton, Colo. v. Z.J. Gifts D-4, L.L.C., 541 U.S. 774, 783 (2004) (statute providing that an "adult business" license shall be denied if the applicant, inter alia, "provides false information" is based on "objective criteria"); Thomas v. Chi. Park Dist., 534 U.S. 316, 324 (2002) (statute that allows denial of a large public assembly permit based on, inter alia, the application containing "a material falsehood or misrepresentation" is based on "reasonably specific and objective" grounds). Individual disputes about the accuracy of an answer may be addressed under the statute's provision for judicial review, an option that Hightower declined to use.

---

the application form or renewal form for a concealed handgun license . . . ."); R.I. Gen. Laws § 11-47-23 ("No person shall, . . . in applying for a license to carry [a firearm], give false information or offer false evidence of his or her identity."); Tex. Gov't Code Ann. § 411.186(a) ("The department shall revoke a license under this section if the license holder: . . . (2) made a material misrepresentation or failed to disclose a material fact in an application submitted under this subchapter . . . ."); Utah Code Ann. § 53-5-704(15) ("An individual who knowingly and willfully provides false information on an application filed under this part is guilty of a class B misdemeanor, and the application may be denied, or the permit may be suspended or revoked."); Wash. Rev. Code Ann. § 9.41.070(12) ("In addition to any other penalty provided for by law, the concealed pistol license of a person who knowingly makes a false statement shall be revoked, and the person shall be permanently ineligible for a concealed pistol license.").

Further, the particular question Hightower answered inaccurately in the defendants' view -- whether Hightower had complaints or charges pending against her at the time she was a BPD officer -- was a material question. The existence of such complaints or charges could impact an individual's suitability to possess a firearm, depending on the nature of the underlying complaints. An accurate answer to the question is important to allowing the licensing authority to investigate further and make an informed decision on the licensing application.

Hightower's as-applied challenge to the revocation of her unrestricted Class A license fails. We turn now to her attempt to raise a facial attack

2.    Facial Attack

Hightower's attempt to get a declaration of unconstitutionality of the revocation statute overreaches. Hightower's facial challenge, much like her as-applied challenge, focuses on the discretion conferred by the "suitability" requirement. The "facial" challenge fails for a number of reasons.

The Supreme Court has itself explained that:

> [f]acial challenges are disfavored for several reasons. Claims of facial invalidity often rest on speculation. As a consequence, they raise the risk of "premature interpretation of statutes on the basis of factually barebones records." Sabri v. United States, 541 U.S. 600, 609 (2004) (internal quotation marks and brackets omitted). Facial challenges also run contrary to the fundamental principle of judicial restraint that courts should neither

-30-

> "'anticipate a question of constitutional law in advance of the necessity of deciding it'" nor "'formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.'" Ashwander v. TVA, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) (quoting Liverpool, New York & Philadelphia S.S. Co. v. Commissioners of Emigration, 113 U.S. 33, 39 (1885)). Finally, facial challenges threaten to short circuit the democratic process by preventing laws embodying the will of the people from being implemented in a manner consistent with the Constitution. We must keep in mind that "'[a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people.'" Ayotte v. Planned Parenthood of Northern New Eng., 546 U.S. 320, 329 (2006) (quoting Regan v. Time, Inc., 468 U.S. 641, 652 (1984) (plurality opinion)).

Wash. State Grange v. Wash. State Republican Party, 128 S. Ct. 1184, 1191 (2008).

For Hightower's facial attack to succeed, Hightower "would have to establish . . . that the statute lacks any 'plainly legitimate sweep.'"[13] United States v. Stevens, 130 S. Ct. 1577,

---

[13] In United States v. Salerno, 481 U.S. 739 (1987), the Court stated that a plaintiff can only succeed in a facial challenge by "establish[ing] that no set of circumstances exists under which the Act would be valid." Id. at 745. In Washington State Grange v. Washington State Republican Party, 128 S. Ct. 1184 (2008), the Court noted that "some Members of the Court have criticized the Salerno formulation," but that "all agree that a facial challenge must fail where the statute has a 'plainly legitimate sweep.'" Id. at 1190 (quoting Washington v. Glucksberg, 521 U.S. 702, 740 n.7 (1997) (Stevens, J., concurring in the judgment)). The Court again declined to determine which of these formulations was controlling in United States v. Stevens, 130 S. Ct. 1577, 1587 (2010): "Which standard applies in a typical case is a matter of dispute that we need not and do not address, and neither Salerno nor Glucksberg is a speech case."

We have explained in a case raising a facial challenge

-31-

1587 (2010) (quoting Washington v. Glucksberg, 521 U.S. 702, 740 n.7 (1997) (Stevens, J., concurring in the judgment)). Hightower bears the burden of demonstrating that this standard is met, and she has not and cannot do so. See id.; see also United States v. Salerno, 481 U.S. 739, 745 (1987); McCullen v. Coakley, 571 F.3d 167, 174 (1st Cir. 2009); Del Gallo v. Parent, 557 F.3d 58, 68 (1st Cir. 2009).

---

under the Second Amendment that the challenge "must fail if we determine that the statute 'has a plainly legitimate sweep,'" without addressing whether that formulation or the Salerno formulation is controlling. United States v. Booker, 644 F.3d 12, 22 (1st Cir. 2011) (quoting Wash. State Grange, 128 S. Ct. at 1190), cert. denied, 132 S. Ct. 1538 (2012). We have applied the Salerno formulation in a number of non-Second Amendment cases. See Del Gallo v. Parent, 557 F.3d 58, 68 (1st Cir. 2009); Dutil v. Murphy, 550 F.3d 154, 160 (1st Cir. 2008). We have also noted that the "plainly legitimate sweep" language is a "refinement" of the Salerno formulation. McCullen v. Coakley, 571 F.3d 167, 174 (1st Cir. 2009). We do not resolve this issue here.

Other circuits have applied the Salerno formulation in cases raising facial challenges under the Second Amendment. See GeorgiaCarry.Org, Inc. v. Georgia, No. 11-10387, 2012 WL 2947817, at *8 (11th Cir. July 20, 2012) (to be published in F.3d); United States v. Decastro, 682 F.3d 160, 163 (2d Cir. 2012); United States v. Tooley, No. 10-4936, 2012 WL 698885, at *2 (4th Cir. Mar. 6, 2012) (per curiam); United States v. Bena, 664 F.3d 1180, 1182 (8th Cir. 2011); United States v. Barton, 633 F.3d 168, 172 (3d Cir. 2011).

Two courts have rejected facial challenges in the Second Amendment context on the basis that "a person . . . to whom a statute was constitutionally applied, 'will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court.'" Masciandaro, 638 F.3d at 474 (quoting Broadrick v. Oklahoma, 413 U.S. 601, 610 (1973)); see also United States v. Skoien, 614 F.3d 638, 645 (7th Cir. 2010) (en banc) ("A person to whom a statute properly applies can't obtain relief based on arguments that a differently situated person might present."), cert. denied, 131 S. Ct. 1674 (2011).

Hightower's general attack is that the suitability requirement confers too much discretion and is not sufficently connected to a sufficient government interest. That attack does not establish that there is no "plainly legitimate sweep" of circumstances where an applicant may properly be denied a license on the grounds of unsuitability. Our review of Hightower's own as-applied claim outlines one set of circumstances where the suitability requirement is clearly constitutional: where false information is provided on an application form. Because Hightower has not shown that the statute lacks any plainly legitimate sweep, her facial attack fails.

We also note that weighing against the facial challenge is the fact that the Supreme Judicial Court has not had the opportunity to interpret the statute in light of Heller and McDonald. The Massachusetts courts have seldom had occasion to interpret the suitable person requirement.[14] The statute itself

---

[14] To be clear, there is no suitable person requirement for issuance of an FID card; an FID card "shall issue, unless the applicant" is statutorily disqualified. Mass. Gen. Laws ch. 140, § 129B(1). An FID card may only be revoked "upon the occurrence of any event that would have disqualified the holder from being issued such card or from having such card renewed or for a violation of a restriction provided under this section." Id. § 129B(4). Judicial review is available in the district court, and "[a] justice of such court, after a hearing, may direct that a card be issued or reinstated to the petitioner if the justice finds that such petitioner is not prohibited by law from possessing such card." Id. § 129B(5).

The statute governing FID cards does provide that "[a] firearm identification card shall not entitle a holder thereof to possess . . . a non-large capacity firearm." Id. § 129B(6).

does not define what constitutes "a suitable person to be issued" a firearms license. Mass. Gen. Laws ch. 140, § 131(d). In a series of pre-Heller cases, Massachusetts courts have stated that "the licensing authority is given considerable latitude" in determining who is a suitable person. Ruggiero v. Police Comm'r, 464 N.E.2d 104, 107 (Mass. App. Ct. 1984); accord Howard v. Chief of Police, 794 N.E.2d 604, 606 (Mass. App. Ct. 2003) ("The 'suitable person' standard vests in the chief broad discretion or 'considerable latitude.'" (quoting Ruggiero, 464 N.E.2d at 107)); Godfrey v. Chief of Police, 616 N.E.2d 485, 487 (Mass. App. Ct. 1993) (same); MacNutt v. Police Comm'r, 572 N.E.2d 577, 580 (Mass. App. Ct. 1991) (noting "[t]he broad grant of discretion implicit in a statute which lacks guidelines").[15]

Still, even before Heller, Massachusetts courts had recognized that the discretion vested in the licensing authority is not unlimited. See MacNutt, 572 N.E.2d at 580 (noting that the

---

However, the Supreme Judicial Court has made clear that an FID card permits possession of a firearm, as defined in § 121, in one's home or place of business. See Commonwealth v. Gouse, 965 N.E.2d 774, 785 n.14 (Mass. 2012); Commonwealth v. Johnson, 958 N.E.2d 25, 34 n.14 (Mass. 2011); Commonwealth v. Powell, 946 N.E.2d 114, 127-128 (Mass. 2011), cert. denied, 132 S. Ct. 1739 (2012).

[15] Earlier cases interpreting the suitable person requirement have noted that because there is "no right to keep and bear arms" on the part of private citizens, "there is no 'question of a property right or deprivation of liberty involved in the statutory procedures for obtaining a license to carry firearms.'" Howard v. Chief of Police, 794 N.E.2d 604, 607 (Mass. App. Ct. 2003) (quoting Chief of Police v. Moyer, 453 N.E.2d 461, 464 (Mass. App. Ct. 1983)).

grant of discretion "'may be limited properly by judicial interpretation' to measures which are not arbitrary or capricious" (quoting Caswell v. Licensing Comm'n, 444 N.E.2d 922, 928 (Mass. 1983))); Stavis v. Carney, 12 Mass. L. Rep. 3, 2000 WL 1170090, at *4-5 (Mass. Super. Ct. 2000) ("The standard for issuing licenses to carry under § 131 must be interpreted in accordance with the intent of the legislature. . . . 'The goal of firearms legislation in Massachusetts is to limit access to deadly weapons by irresponsible persons.' . . . [T]he licensing authority has the authority to require an otherwise eligible applicant for a license to carry a firearm to comply with any other requirements that are reasonably related to the goal of keeping firearms out of the hands of irresponsible people." (quoting Ruggiero, 464 N.E.2d at 106)).[16]

---

[16] "Suitable person" requirements are present in other states' firearms licensing regimes. See Ala. Code § 13A-11-75 (sheriff "may issue a qualified or unlimited license" to carry a pistol in a vehicle or concealed on a person if, among other requirements, the applicant "is a suitable person to be so licensed"); Conn. Gen. Stat. § 29-28(b) (temporary license "may" be issued to carry a pistol or revolver upon a finding that the applicant "is a suitable person to receive such permit"); Haw. Rev. Stat. Ann. § 134-9(b)(2) (chief of police is to adopt procedures to grant licenses to carry concealed weapons to individuals who "[a]ppear to be a suitable person to be so licensed"); N.H. Rev. Stat. Ann. § 159:6(I) (license to carry a revolver or pistol may only be issued "if it appears that the applicant . . . is a suitable person to be licensed"); R.I. Gen. Laws § 11-47-11(a) (license to carry a concealed pistol or revolver may only be issued "if it appears that the applicant . . . is a suitable person to be so licensed").
A district court has rejected an argument that Connecticut's similar suitable person requirement confers too much discretion and so is unconstitutional. Kuck v. Danaher, 822 F. Supp. 2d 109, 129 (D. Conn. 2011). The court found that "it is impossible for the legislature to conceive in advance each and

-35-

No Massachusetts appellate court has construed the suitable person requirement in a published opinion post-<u>Heller</u> or post-<u>McDonald</u>. The Supreme Judicial Court has never construed it, save for one limited question.[17] While these considerations would not independently bar Hightower's facial challenge, <u>see</u> <u>City of Lakewood</u> v. <u>Plain Dealer Publ'g Co.</u>, 486 U.S. 750, 770 n.11 (1988) ("[W]e have never held that a federal litigant must await a state-court construction . . . before bringing the federal suit."), they do weigh against it, <u>see</u> <u>Wash. State Grange</u>, 128 S. Ct. at 1190-91 (noting that a state had not had an opportunity "to accord the law a limiting construction to avoid constitutional questions," and that "[e]xercising judicial restraint in a facial challenge 'frees the Court . . . from premature interpretations of statutes in areas where their constitutional application might be cloudy'" (quoting <u>United States</u> v. <u>Raines</u>, 362 U.S. 17, 22 (1960))).

Hightower attempts to avoid these principles by making a qualitatively different argument. Hightower argues that her facial challenge should succeed under particular doctrines that were

---

every circumstance in which a person could pose an unacceptable danger to the public if entrusted with a firearm," so a scheme conferring "circumscribed discretion" on the licensing official was constitutional. <u>Id.</u>

[17] The Supreme Judicial Court in <u>DeLuca</u> v. <u>Chief of Police</u>, 612 N.E.2d 628 (Mass. 1993), held that the licensing authority may consider unsealed records of a criminal conviction to determine whether an applicant is a suitable person, even where the applicant had received a pardon for the crime. <u>Id.</u> at 630.

developed under the First Amendment: the prior restraint and overbreadth doctrines. We disagree and find these First Amendment doctrines a poor analogy for purposes of facial challenges under the Second Amendment.

Based on the prior restraint doctrine, Hightower argues she may challenge the "unbridled discretion" conferred by the suitable person requirement regardless of the facts that she did not apply for another license and that the suitability requirement was constitutionally applied to her.

Under the First Amendment, "when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." City of Lakewood, 486 U.S. at 755-56. Such "[f]acial attacks on the discretion granted a decisionmaker are not dependent on the facts surrounding any particular permit decision" and may be brought regardless of whether the government official "has exercised his discretion" in an impermissible fashion. Forsyth County v. Nationalist Movement, 505 U.S. 123, 133 n.10 (1992).

That rationale is particular to the First Amendment: "[a]t the root of this long line of precedent is the time-tested knowledge that in the area of free expression a licensing statute placing unbridled discretion in the hands of a government official

or agency constitutes a prior restraint and <u>may result in censorship</u>." <u>City of Lakewood</u>, 486 U.S. at 757 (emphasis added). The Court has summarized[18] that there are "two major First Amendment risks associated with unbridled licensing schemes: self-censorship by speakers in order to avoid being denied a license to speak; and the difficulty of effectively detecting, reviewing, and correcting content-based censorship 'as applied' without standards by which to measure the licensor's action." <u>Id.</u> at 759. It is only "when statutes threaten these risks to a significant degree that courts must entertain an immediate facial attack on the law." <u>Id.</u> The Court made clear that for a facial challenge to be proper, "[t]he law must have a close enough nexus to expression, or to conduct

_____

[18] More specifically, the Court has identified several "identifiable risks to free expression that can be effectively alleviated only through a facial challenge" in the First Amendment context. <u>City of Lakewood</u> v. <u>Plain Dealer Publ'g Co.</u>, 486 U.S. 750, 757 (1988). "First, the mere existence of the licensor's unfettered discretion, coupled with the power of prior restraint, intimidates parties into censoring their own speech, even if the discretion and power are never actually abused." <u>Id.</u> The Court explained that "[i]t is not difficult to visualize a newspaper that relies to a substantial degree on single issue sales feeling significant pressure to endorse the incumbent mayor in an upcoming election, or to refrain from criticizing him, in order to receive a favorable and speedy disposition on its permit application." <u>Id.</u> at 757-58. The Court also explained that it would be difficult to distinguish "between a licensor's legitimate denial of a permit and its illegitimate abuse of censorial power," and that it would be difficult to tell if the licensor was "suppressing unfavorable . . . expression." <u>Id.</u> at 758. The Court also noted that the "difficulty and delay" of as-applied challenges could discourage litigation, which could result in the hypothetical newspaper finding it "easier to capitulate to what it perceives to be the mayor's preferred viewpoint." <u>Id.</u>

commonly associated with expression, to pose a real and substantial threat of the identified censorship risks."  Id.  The prior restraint doctrine is specific to the First Amendment and stems from the substantive First Amendment restrictions.  See generally Monaghan, First Amendment "Due Process", 83 Harv. L. Rev. 518, 519 (1970) ("Like the substantive rules themselves, insensitive procedures can 'chill' the right of free expression.").  The prior restraint doctrine is not a label that may be attached to allow any facial challenge, whatever the constitutional ground.

Other courts, at the district court level, agree.  See Woollard v. Sheridan, No. L-10-2068, 2012 WL 695674, at *7-8 (D. Md. Mar. 2, 2012) (to be published in F. Supp. 2d) (rejecting the argument that a licensing scheme "amounts to an unconstitutional prior restraint on the exercise of [plaintiff's] Second Amendment rights because it vests unbridled discretion in the officials responsible for issuing permits," in part because "this Court would be hesitant to import constitutional doctrine wholesale from one field of law into another for which it was never designed"); Piszczatoski v. Filko, 840 F. Supp. 2d 813, 831-32 (D.N.J. 2012) (rejecting the argument that a statute is invalid under the Second Amendment if it vests "uncontrolled discretion," in part because "[t]he general rule is that facial challenges are disfavored.  It is only in light of particular censorship related concerns that 'they have been permitted in the First Amendment context where the

licensing scheme vests unbridled discretion in the decisionmaker and where the regulation is challenged as overbroad.'" (quoting FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 223 (1990))); Kachalsky, 817 F. Supp. 2d at 267 n.32 (rejecting the argument that a statute is invalid based on analogy to First Amendment cases prohibiting "unbridled discretion" in granting permits, and explaining that while some Second Amendment "cases borrow an analytical framework, they do not apply substantive First Amendment rules in the Second Amendment context"). We have found no circuit cases that have discussed the prior restraint doctrine in the context of the Second Amendment.

Hightower's second argument -- based on the overbreadth doctrine -- fails for similar reasons. The overbreadth doctrine is "a second type of facial challenge," under which a law may be invalidated under the First Amendment "as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" Stevens, 130 S. Ct. at 1587 (quoting Wash. State Grange, 128 S. Ct. at 1190 n.6) (internal quotation marks omitted). An overbreadth challenge essentially argues that a "statute could not be enforced against [a plaintiff], because it could not be enforced against someone else." Sabri v. United States, 541 U.S. 600, 609 (2004).

The Supreme Court has cautioned courts against allowing overbreadth challenges outside of certain limited contexts:

-40-

Facial challenges of this sort are especially to be discouraged. Not only do they invite judgments on fact-poor records, but they entail a further departure from the norms of adjudication in federal courts: overbreadth challenges call for relaxing familiar requirements of standing, to allow a determination that the law would be unconstitutionally applied to different parties and different circumstances from those at hand. See, e.g., Chicago v. Morales, 527 U.S. 41, 55-56 n.22 (1999) (plurality opinion). Accordingly, we have recognized the validity of facial attacks alleging overbreadth (though not necessarily using that term) in relatively few settings, and, generally, on the strength of specific reasons weighty enough to overcome our well-founded reticence. See, e.g., Broadrick v. Oklahoma, 413 U.S. 601 (1973) (free speech); Aptheker v. Secretary of State, 378 U.S. 500 (1964) (right to travel); Stenberg v. Carhart, 530 U.S. 914, 938-946 (2000) (abortion); City of Boerne v. Flores, 521 U.S. 507, 532-535 (1997) (legislation under § 5 of the Fourteenth Amendment). . . . Outside these limited settings, and absent a good reason, we do not extend an invitation to bring overbreadth claims.

Id. at 609-10.

Hightower argues that Heller was an instance where the Court "struck down broad prohibitions on Second Amendment rights that could be validly applied to dangerous people," and so implicitly recognized an overbreadth doctrine in the Second Amendment context. We disagree.

Heller involved a challenge to a "total ban" on handgun possession in the home, brought by an individual whose attempt to register the handgun was denied based on this ban. Heller, 128 S.

-41-

Ct. at 2788. That was not an overbreadth challenge; Heller's argument was that the total ban was unconstitutional, including as applied to his registration attempt.

We reject the overbreadth argument in light of Sabri.[19] Our view is joined by every court to have expressly considered the issue. See United States v. Decastro, 682 F.3d 160, 169 (2d Cir. 2012) (holding that "[t]here is no overbreadth argument that Decastro can make in the Second Amendment context," and so, since his as-applied challenge failed, the facial challenge must necessarily fail as well); Masciandaro, 638 F.3d at 474 (declining to entertain "the novel notion that an overbreadth challenge could be recognized" outside the First Amendment context, and rejecting a facial challenge on the basis that the as-applied challenge failed); Barton, 633 F.3d at 172 n.3 (rejecting facial challenge under the Second Amendment because "we do not recognize an 'overbreadth' doctrine outside the limited context of the First Amendment"); United States v. Skoien, 614 F.3d 638, 645 (7th Cir. 2010) (en banc) (noting that the Court has "allowed 'overbreadth' arguments when dealing with laws that restrict speech," but that the Salerno formulation governs other contexts), cert. denied, 131

---

[19] Hightower's overbreadth claim would also fail on its own terms. Courts "generally do not apply the 'strong medicine' of overbreadth analysis where the parties fail to describe the instances of arguable overbreadth of the contested law." Wash. State Grange, 128 S. Ct. at 1190 n.6. Hightower does not outline instances where the suitability requirement would be unconstitutional.

-42-

S. Ct. 1674 (2011); United States v. Weaver, No. 2:09-cr-00222, 2012 WL 727488, at *9 (S.D. W. Va. Mar. 6, 2012) ("[A] party challenging the validity of a law on vagueness or overbreadth grounds outside the domain of the First Amendment must demonstrate that the law is unconstitutional in all of its applications."); Richards v. County of Yolo, 821 F. Supp. 2d 1169, 1176 (E.D. Cal. 2011) (rejecting attempt to import facial-challenge doctrines from the First Amendment context); Kachalsky, 817 F. Supp. 2d at 272 n.37 (rejecting application of overbreadth doctrine where as-applied Second Amendment claim fails); see also United States v. Tooley, No. 10-4936, 2012 WL 698885, at *2 (4th Cir. Mar. 6, 2012) (per curiam) ("Tooley also made a facial challenge to § 922(g)(9) in his motion to dismiss the indictment and continues the argument on appeal. However, to prevail on a facial challenge, Tooley 'must establish that no set of circumstances exists under which the Act would be valid. By finding the statute valid as applied to th[is] plaintiff[], the facial challenge fails as well.'" (alterations in original) (quoting Urofsky v. Gilmore, 216 F.3d 401, 427 n.1 (4th Cir. 2000))).

The facial attack fails.

C.       Equal Protection Claim

Hightower advances an equal protection claim in a cursory fashion, stating that the revocation of her license violated equal protection for the same reasons as advanced in support of her

Second Amendment claim. Even were this claim not waived,[20] it fails on its own terms.[21]

Given that the Second Amendment challenge fails, the equal protection claim is subject to rational basis review. See Nordyke v. King, 681 F.3d 1041, 1043 n.2 (9th Cir. 2012) (en banc) ("As to the [plaintiffs'] equal protection claim, because the ordinance does not classify shows or events on the basis of a suspect class, and because we hold that the ordinance does not violate either the First or Second Amendments, rational basis scrutiny applies."); Kwong v. Bloomberg, No. 11 Civ. 2356(JGK), 2012 WL 995290, at *12 (S.D.N.Y. Mar. 26, 2012) (to be published in F. Supp. 2d) ("Rational basis review is the appropriate standard of scrutiny to apply to Penal Law § 400.00(14) because the law involves no suspect classification and imposes no burden on the Second Amendment right to keep and bear arms." (footnote omitted)); cf. Locke v. Davey, 540 U.S. 712, 720 n.3 (2004) ("Because we hold . . . that the program is not a violation of the Free Exercise

---

[20] See San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, No. 09-2566, 2012 WL 3002559, at *20 (1st Cir. July 24, 2012) (to be published in F.3d) (en banc).

[21] The equal protection claim also fails because Hightower does not attempt to demonstrate that she was treated differently from other similarly situated individuals. See Kuperman v. Wrenn, 645 F.3d 69, 77-78 (1st Cir. 2011) ("To establish an equal protection violation, a plaintiff must introduce sufficient evidence from which a jury reasonably could conclude that, compared with others similarly situated, the plaintiff was treated differently because of an improper consideration . . . .").

-44-

Clause, however, we apply rational-basis scrutiny to [plaintiff's] equal protection claims."); McGuire v. Reilly, 260 F.3d 36, 50 (1st Cir. 2001) (where statute satisfies First Amendment review, it "necessarily passes the rational basis test employed under the Equal Protection Clause").  For the reasons given above as to why Hightower's as-applied claim fails, the license revocation survives rational basis review under the Equal Protection Clause.

D.        Procedural Due Process Claim

Hightower's procedural due process claim is that the BPD was required to give her a hearing before it revoked her license and that the availability of postdeprivation relief is inadequate.

We will assume Hightower has a property interest in her Class A weapon license although she may be eligible for other licenses.  In United States v. Rehlander, 666 F.3d 45 (1st Cir. 2012), we said:

> [T]he right to possess arms (among those not properly disqualified) is no longer something that can be withdrawn by government on a permanent and irrevocable basis without due process.  Ordinarily, to work a permanent or prolonged loss of a constitutional liberty or property interest, an adjudicatory hearing, including a right to offer and test evidence if facts are in dispute, is required.

Id. at 48.  Rehlander, however, did not concern licenses to carry concealed weapons, much less large capacity weapons, but a disqualification from possession of firearms at all.

-45-

The parties dispute whether the deprivation here is either permanent or irrevocable. After all, as defendants argue, if all Hightower wants is to carry a small weapon (the five-round revolver which she had been carrying), she may apply for a Class B license.

We take the case as it comes to us, as a ripe case on a record of actual deprivation from the revocation of her Class A license. We also assume, in Hightower's favor, that she does have some Second Amendment interests arising from the revocation of her license. We avoid these underlying questions and assume the requirements of due process apply.

Hightower's primary argument as to why due process was not provided to her is that she was entitled to a predeprivation hearing before her license was revoked and before her gun was required to be turned over to the licensing authority. In support of this point, she also asserts that the postdeprivation process available was inadequate. We reject her claim.

1.    <u>Predeprivation Process</u>

Under the Massachusetts licensing scheme, before a license may be revoked, the licensing authority must determine that there was an "occurrence of any event that would have disqualified the holder from being issued such license or from having such license renewed," or that "it appears that the holder is no longer a suitable person to possess such license." Mass. Gen. Laws ch.

140, § 131(f).  The statute provides that "[a]ny revocation or suspension of a license shall be in writing and shall state the reasons therefor."  Id.  It is undisputed that this requirement was complied with here.

We reject Hightower's claim that due process required that a hearing take place before her license could be revoked.  The predeprivation process provided here was constitutionally adequate, when considered in conjunction with the available postdeprivation process.  The Supreme Court "has recognized, on many occasions, that where a State must act quickly, or where it would be impractical to provide predeprivation process, postdeprivation process satisfies the requirements of the Due Process Clause."  Gilbert v. Homar, 520 U.S. 924, 930 (1997).  We have explained that "[t]he variety of . . . circumstances within which the exception [to the general requirement of predeprivation process] has been recognized demonstrates that the exception is a flexible one."  San Gerónimo Caribe Project, Inc. v. Acevedo-Vilá, No. 09-2566, 2012 WL 3002559, at *17 (1st Cir. July 24, 2012) (to be published in F.3d) (en banc) (omission and second alteration in original) (quoting Elena v. Municipality of San Juan, 677 F.3d 1, 6 (1st Cir. 2012)) (internal quotation marks omitted).

The Supreme Court has explained that "[p]rotection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action.  Indeed,

-47-

deprivation of property to protect the public health and safety is '[one] of the oldest examples' of permissible summary action." Hodel v. Va. Surface Mining & Reclamation Ass'n, 452 U.S. 264, 300 (1981) (second alteration in original) (quoting Ewing v. Mytinger & Casselberry, Inc., 339 U.S. 594, 599 (1950)); see also San Gerónimo, 2012 WL 3002559, at *17. The Court has "traditionally accorded the states great leeway in adopting summary procedures to protect public health and safety." Mackey v. Montrym, 443 U.S. 1, 17 (1979) (upholding statutory scheme providing for summary suspension of a driver's license if a driver suspected of being intoxicated refuses to take a breathalyzer test). In such circumstances, full predeprivation process is not required so long as "prompt postdeprivation review is available for correction of administrative error."[22] Id. at 13.

The revocation of a firearms license, particularly a license to carry a concealed, large capacity weapon, without a predeprivation hearing is justified by concerns as to public health and safety.[23] See Kuck v. Danaher, 600 F.3d 159, 166 (2d Cir. 2010) ("Connecticut clearly has a strong and compelling interest in

_____

[22] We note that the federal Administrative Procedure Act provides for notice and an opportunity to demonstrate compliance with licensing requirements before "revocation . . . of a license," "[e]xcept in cases of willfulness or those in which public health, interest, or safety requires otherwise." 5 U.S.C. § 558(c).

[23] Between January 1, 2005, and March 1, 2011, there were 1,876 shootings in the City of Boston, 301 of which were fatal.

ensuring that firearm permits are not issued to those 'lacking the essential character or temperament necessary to be entrusted with a weapon.'" (quoting Dwyer v. Farrell, 475 A.2d 257, 260 (Conn. 1984))); Spinelli v. City of New York, 579 F.3d 160, 170-71 (2d Cir. 2009) (holding that predeprivation process was not required to suspend gun dealer's license where there were security lapses at the gun store, given the interest in public safety); Hain v. DeLeo, No. 1:08-CV-2136, 2010 WL 4514315, at *8 (M.D. Pa. Nov. 2, 2010) (rejecting the claim that revocation of a firearms license requires a predeprivation hearing, in part because "the state interest in protecting the public safety through the enforcement of licensure requirements is compelling. . . . [A predeprivation hearing] would significantly burden the state interest in quickly removing licenses from individuals who prove to be dangerous after their license has been issued"); Thomson v. Bd. of Firearms Permit Exam'rs, No. NNH950369628, 1996 WL 24701, at *4 (Conn. Super. Ct. Jan. 4, 1996) (holding that no predeprivation hearing need be held to revoke a pistol permit, in part because, given "the nature of weapons and their potential for inflicting harm or causing death, recognition of a right to continue to carry a weapon between the time that evidence of unsuitability arises and completion of notice and a hearing would impose a great risk to the public whose interests the government must protect"); Rabbitt v. Leonard, 413 A.2d 489, 491, 493 (Conn. Super. Ct. 1979) (holding that, while the

Connecticut constitution provides a right to bear arms "which must be protected by procedural due process," predeprivation process for revoking a pistol permit is not required, in part because "[t]he summary nature of a pistol permit revocation is vital to protect the public safety. A permittee who is, in fact, unfit to carry a pistol could conceivably do a great deal of harm if given advance notice that his permit might be revoked; it could even result in the loss of human life. The risk is too great.").

To the extent that Hightower separately argues that she was entitled to a hearing before surrendering her firearm itself, the argument fails because Hightower could have retained her firearm had she appealed the revocation of her license. The revocation statute provides that "[u]pon revocation or suspension, the licensing authority shall take possession of such license and the person whose license is so revoked or suspended shall take all actions required under the provisions of section 129D. No appeal or post-judgment motion shall operate to stay such revocation or suspension." Mass. Gen. Laws ch. 140, § 131(f). The license revocation letter Hightower received stated that Hightower "shall, in accordance with M.G.L. c. 140, § 129D, without delay, deliver or surrender to the licensing authority where you reside your licenses to carry, and all firearms." Section 129D, in turn, provides that "[u]pon revocation . . . of any firearms license if [a] firearms identification card is not then in force . . . the person whose

application was so revoked . . . shall without delay deliver or surrender, to the licensing authority where he resides, all firearms . . . which he then possesses <u>unless an appeal is pending</u>." <u>Id.</u> § 129D (emphasis added). The Supreme Judicial Court has noted that under § 129D, "the obligation to turn over the firearms is suspended during the pendency of such an appeal." <u>Pasqualone</u> v. <u>Gately</u>, 662 N.E.2d 1034, 1038 (Mass. 1996).[24]

### 2. Postdeprivation Process

As to postdeprivation process, the statute provides that if a license is suspended or revoked, the aggrieved individual may "file a petition to obtain judicial review in the district court" within ninety days after receiving notice of the revocation or suspension. Mass. Gen. Laws ch. 140, § 131(f). The statute requires the district court to hold "a hearing" before making a determination as to the licensing decision, <u>id.</u>, and the Massachusetts courts, before <u>Heller</u>, interpreted the statute as requiring "an evidentiary hearing." <u>Godfrey</u>, 616 N.E.2d at 487; <u>see</u> <u>also</u> <u>Moyer</u>, 453 N.E.2d at 464. After such a hearing, a justice of the reviewing court "may direct that a license be issued or reinstated to the petitioner if such justice finds that there was no reasonable ground for denying, suspending or revoking such

---

[24] Section 129D also enables the owner of the firearm, within a year after surrender, to direct the custodian of the firearm to transfer it to "any . . . person legally permitted to purchase or take possession of such firearms." Mass. Gen. Laws ch. 140, § 129D.

license and the that petitioner is not prohibited by law from possessing same." Mass. Gen. Laws ch. 140, § 131(f). This provision has been interpreted, in pre-Heller cases, as placing the burden of proof on the applicant to show that the licensing authority's decision "was arbitrary, capricious, or an abuse of discretion." Howard, 794 N.E.2d at 606 (quoting Moyer, 453 N.E.2d at 464) (internal quotation mark omitted); see also Godfrey, 616 N.E.2d at 488 (stating same standard); Ruggiero, 464 N.E.2d at 107 (same). Further judicial review may be had "in an action in the nature of certiorari under" Mass. Gen. Laws ch. 249, § 4. Levine, 750 N.E.2d at 1000.

Hightower's only argument as to why these postdeprivation procedures are inadequate is that the standard of review places the burden of proof on the individual challenging the revocation. Hightower failed to develop the argument or cite to any pertinent authority in her opening brief, so this claim is waived. See United States v. Berk, 652 F.3d 132, 137 n.5 (1st Cir. 2011) (issues not developed in the opening brief are waived), cert. denied, 132 S. Ct. 1650 (2012).

We also reject the notion that the arbitrary and capricious standard of review, in conjunction with an evidentiary hearing where the aggrieved individual may introduce evidence to demonstrate that the licensing decision was erroneous, renders the postdeprivation judicial process inadequate. The arbitrary and

-52-

capricious standard of review is widely accepted in the context of reviewing agency action.  See, e.g., 5 U.S.C. § 706(2)(A).  And, unlike typical administrative review provisions, the Massachusetts statute allows the aggrieved individual to introduce new evidence before the reviewing court as to the licensing authority's determination.  See Stavis, 2000 WL 1170090, at *6 ("In one respect, the nature of the judicial review available in the district court under G.L. c. 140, § 131 is clearly broader than the review available under [Massachusetts's general administrative review provision] because the district court is authorized to re-examine the facts found by the licensing authority and find facts.").

In addition, the Supreme Court has explained that "[o]utside the criminal law area, where special concerns attend, the locus of the burden of persuasion is normally not an issue of federal constitutional moment."  Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 58 (2005) (alteration in original) (quoting Lavine v. Milne, 424 U.S. 577, 585 (1976)) (internal quotation marks omitted).  The Massachusetts legislature could have reasonably concluded that, on review in the district court, the burden should be placed on the aggrieved individual, who would be in the best position to present relevant evidence as to the suitability requirement.  We reject Hightower's claim that the revocation scheme violates procedural due process.

## III.

We affirm the district court's entry of judgment against Hightower.